Filed 5/20/22  P. v. Lopez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEVEN MICHAEL LOPEZ,<br><br>Defendant and Appellant. | F080683<br><br>(Super. Ct. No. VCF361905D)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Robert K. Gezi, Lewis A. Martinez, Kari Mueller, Amanda D. Cary, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Stephen Michael Lopez and three codefendants—Robert Ramos, Francisco Nava, and Ruben Perez—engaged in a confrontation at a convenience store with E.D. and his girlfriend, C.A. They yelled rival gang slurs at E.D., Lopez and Perez threw drinks into the car E.D. and C.A. were sitting in, and Lopez grabbed E.D.'s shirt, struck him in the back of the head, and scratched his neck. Perez also tried to grab E.D. E.D. drove away. E.D. saw a black car speeding toward him, heard two gunshots and glass breaking, and felt an impact on his car. He saw the black car on the left side of his car and the back passenger window rolled down.

The four defendants were charged with multiple offenses in relation to the incident. At trial, the prosecution presented expert testimony on street gangs, evidence of the defendants' prior contacts with police, and certified records of conviction of Norteño gang members as proof of a pattern of gang activity to prove the street gang enhancements.

The jury acquitted the four defendants of attempted murder of E.D. and C.A. (counts 1 and 2, respectively) and was deadlocked on the lesser included offense of attempted voluntary manslaughter. The jury convicted all four defendants of shooting into an occupied motor vehicle in violation of Penal Code section 246 (count 3) and found true allegations a principal used a firearm (§ 12022.53, subds. (c) & (e)(1)) and that the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). (Undesignated statutory references are to the Penal Code.) The jury was deadlocked as to all four defendants on count 4, criminal street gang conspiracy in violation of section 182.5. The jury convicted Lopez and Perez of battery in violation of section 242 in count 5 and found true an enhancement alleging the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). The jury convicted Lopez of possession of a firearm by a convicted felon in violation of section 29800, subdivision (a)(1) (count 6).

2.

Lopez now challenges the judgment on multiple grounds. He first contends there was insufficient evidence to support his convictions for shooting at an occupied vehicle (count 3) and illegal possession of a firearm (count 6). He also argues the evidence was insufficient to support the gang enhancements because the People failed to meet their evidentiary burden under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). And he contends the court erred in staying, rather than striking, his prior serious felony enhancement. In supplemental briefing, he further challenges the validity of the gang enhancements and firearm enhancement under the Legislature's recent passage of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which, in part, amended the language of section 186.22 to modify the showing necessary to sustain a gang enhancement. Lopez asserts the changes enacted by Assembly Bill 333 are retroactive and, accordingly, his gang enhancements should be reversed and retried under the new requirements of section 186.22. He also argues his case should be remanded for resentencing under recently enacted Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567).

We agree Assembly Bill 333 applies retroactively and Lopez is entitled to reversal of his gang enhancements and firearm enhancement on that basis. However, we affirm Lopez's convictions for shooting at an occupied motor vehicle, battery, and felon in possession of a firearm. We remand for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND**

*February 3, 2018 Incident*

In the evening of February 3, 2018, E.D. was at a convenience store with his girlfriend C.A.; E.D. was wearing a navy blue shirt. They met E.D.'s parents for dinner. E.D. testified codefendants Nava and Ramos approached E.D. when he was at the register checking out, though other evidence introduced suggests Ramos did not enter the store. C.A. identified Nava and Lopez as the individuals who approached E.D. inside the store. Officer Michael Elliot, who was tasked with identifying the suspects in the video

3.

surveillance footage from the convenience store, testified Nava and Lopez could be seen inside the store on the day of the incident.

Nava said, "'What's up Ene?'" E.D. testified the statement is "like an initiation from a gang member to another gang member." E.D. smiled and said "What's up?" E.D. walked out of the store toward his car; Lopez and his codefendant Perez followed E.D. and said, "'Fuck Sur trece.'" E.D. understood the statement to mean "disrespect toward the Southerner gang." E.D. testified all four defendants continued to yell disrespectful Southern gang slurs while E.D. and C.A. walked toward his car. E.D. and C.A. got in the car and reversed; E.D. saw Ramos and Nava talking to his mother as she was trying to get in her car. E.D. testified his car had a Los Angeles Dodgers logo decal on it; he and C.A. denied any gang involvement. E.D. rolled his window down halfway to tell the defendants he did not want any problems but, before he could, Lopez and Perez threw drinks into E.D.'s car. Lopez then grabbed and scratched E.D.'s neck; Perez tried to grab E.D., too. E.D. drove off. As he was leaving, E.D. saw Lopez and Perez running to a black four-door sedan; he saw them get into it. He told C.A. to call 911 as he turned onto the road from the driveway. He could see the defendants' car in his rearview mirror exiting from the same driveway.

E.D. got in the far right lane. The defendants pulled up behind E.D.'s car and then next to it. E.D. heard glass breaking, tires screeching, and two gunshots. E.D. and C.A. saw the rear passenger side window of the defendants' car rolled down. E.D. drove back to the convenience store and he and C.A. waited for the police. Both E.D. and C.A. identified Lopez at the preliminary hearings and C.A. identified him in a photographic line-up following the incident.

The manager of the convenience store gave the police the surveillance videos from that day. Officer Elliot identified Perez, Ramos, Nava, and Lopez in the video shown at trial. Officer Elliot testified Ramos could be seen getting into the driver's seat at the gas station/convenience store.

4.

***Gang Expert Testimony***

Before trial, defendant Perez moved to bifurcate the gang allegations. The court noted it would treat the objection as a joint challenge by all the defendants. The court considered the motion and tentatively denied it because the gang allegations and underlying charges overlapped. The prosecutor argued the gang evidence was intertwined with the charges, motive, and intent, and substantive evidence of it would come in with regard to the section 182.5 charge. The court noted it intended to allow the gang expert to testify about the foundational components and opinions regarding the gang allegations and asked for comments from the parties; no objections or comments were made. The court explained to the prosecutor that, "with the *Sanchez* [*People v. Sanchez* (2016) 63 Cal.4th 665] issue," she was going to have to "prove … up individually … with witnesses."

Officer Joel Arjona, who was assigned to the Tulare Area Regional Gang Enforcement Team in February 2018, testified as a gang expert. He discussed his experience working with gangs and how the Norteño and Sureño gangs are structured. He explained both gangs have symbols and signs used to reflect their affiliation. Norteño gang members associate with the number 14 and the color red. They use the huelga bird as a symbol of the gang. Sureño members use the color blue to represent the gang and associate with the number 13. Arjona explained the Norteño gang derives from the prison gang Nuestra Familia. Local street gang members of the Norteño gang report to an individual called a "channel." The "channel" then reports up to a member of Nuestra Familia who oversees the county. He testified Norteño members pay "taxes" that are used for the benefit of the gang. He explained the Norteño gang has different cliques or subsets that all identify with the color red and the number 14. Members of different subsets work together, communicate with one another, commit crimes together, and share information and weapons. He discussed the Norteño subset North Side Visa Boyz (or NSVB) and the symbols and tattoos they used to identify themselves. He stated all

5.

NSVB members are in Tulare County. He testified NSVB is a subset of the Norteño gang in Visalia.

Officer Arjona explained what he deemed to be "primary activities of the Norteno gang" based on his investigations and reports and from speaking to other officers and gang members. The primary activities included "a lot of criminal activities," 33 of which the Penal Code considers "gang crimes." He listed specific gang crimes he opined were primary activities of the Norteño gang including auto theft, possession of firearms, murder, attempted murder, assault, assault with deadly weapons, kidnappings, burglary, and vandalism.

He testified, based on his knowledge, training, and experience, gang members carry weapons at times to protect themselves, to intimidate, to use them, or to transport them from one location to another. They are supposed to tell each other when one is carrying a firearm "so if you get pulled over or something happens, you know what to expect." Given a hypothetical mirroring of the facts of this case, Officer Arjona testified it was his opinion such a crime was committed in association with and for the benefit of the Norteño criminal street gang. He opined, the four gang members in the hypothetical "have one common goal. Maybe they didn't necessarily know the goal when they were going to go to the stop, but eventually the goal was common."

### Predicate Offenses

Officer Arjona testified regarding two specific predicate offenses. He discussed the murder of John Hernandez committed by Norteño gang members Jacob Robles and Julian Gonzalez at the direction of Joe Dominguez, another gang member, on May 19, 2010. Officer Arjona was familiar with the case through his research. Based on his training and experience, speaking with other officers, and reading reports, Officer Arjona testified he believed gang member Joe Dominquez directed the two other gang members to kill the victim, who was a gang dropout. The prosecutor then introduced certified copies of records from that case, *People v. Julian Gonzalez*, case No. VCF241993. The

records reflect the crime was committed in Tulare County and the defendant was convicted of murder on May 15, 2012. The jury found true various enhancements, including a gang enhancement pursuant to former section 186.22, subdivision (b).

Officer Arjona then testified regarding an attempted murder that occurred at the Visalia Mall during business hours on January 27, 2012, by Adrian Esquer and Anthony Hanson. Arjona was not on duty at the time, but he researched the incident after the fact and testified "it was a gang crime." Based on his conversations with the primary detective, study of the case, and review of the contacts of the suspects involved, Arjona concluded the individuals involved were "gang members and that this was an intimidation shooting against a rival gang member. And a person who was caught in crossfire was also struck." He specifically opined Adrian Esquer was a Norteño gang member at the time he committed the offense. He further opined the offense fits within the pattern of Norteño street gang activity in Tulare County. He testified the mall shooting involved "different subsets that were working together. So just because you're part of a different subset doesn't necessarily mean that you're not friends, you're not a Norteño gang member." The People introduced the certified conviction packet for *People v. Adrian Esquer*, case No. VCF263049B for convictions of attempted murder and assault with a firearm in Tulare County, conviction date of January 31, 2014. It also reflects the jury found true gang enhancements pursuant to former section 186.22, subdivision (b).

Officer Arjona testified he reviewed 12 different gang contacts Lopez had with the police. Based on his training, knowledge, experience, and investigation of this case, Officer Arjona opined Lopez was a Norteño gang member in February 2018. Multiple gang validation criteria applied to Lopez including: "the association with, admits to gang membership, named by a reliable source, which would be law enforcement officers as members of the gang unit, associates with gang members, involved in gang-related crimes, gang-associated tattoos, gang clothing or attire."

*Prior Contacts*

Several officers testified independently about contacts they personally had with Lopez.

On June 30, 2016, Officer Michael Lombardo encountered Lopez. He conducted a field interview with him, documented his tattoos, and noted he was wearing red tennis shoes. Lopez had a "Visa" tattoo across his stomach, "North Side" on his forearm, "NSVB" across his chest, one dot on one wrist and four dots on the other. Lopez did not want to answer whether he was a gang member but he denied being a dropout. He was with Nathan Licon, a northern gang member.

On July 13, 2016, Officer Austin Huerta conducted a field interview with defendant Lopez after seeing him walking in the roadway with other Norteño associates. Huerta knew Lopez to be a North Side Visa Boy and Lopez told him he was still in good standing with the gang during that encounter. Huerta documented Lopez's tattoos including an "NSVB" tattoo on Lopez's chest.

On October 30, 2016, Officers Art Alvarez and Dan Ford contacted Lopez, who was wearing a 49'ers jacket, and another individual. They appeared to be having a dispute and a stolen firearm was found on the ground nearby, approximately 10 feet from their location.

On May 10, 2017, Officer Alvarez did a field interview with Lopez during which Lopez admitted to his gang affiliation. Lopez stated "he was an active Northerner with the hood of being a Visa Boy." Officer Alverez explained that means Lopez is a Norteño, "Visa Boy is just a clique or a common hood. It's just the sub-gang that is under the Norteno gang of what he belongs to." Alvarez documented Lopez's tattoos, which included a "114 Percent Buster" tattoo on the back of his head (buster is a derogatory term for a Norteño); "Hood tested; Yard Approved" on his neck, a Tulare County mural with a big "TC" on his back, and "Visa Boyz" on the inside of each forearm.

On August 2, 2017, at the same convenience store where the charged incident began, there was a gang-related shooting involving Lopez. The People introduced surveillance video footage of the store from that day. Lopez and three known Norteño gang members were the victims of the shooting; one of them, Miguel Lopez, was shot in the stomach. Officer Bryan Scott responded to the shooting. Lopez reported to the police the "scraps" (a derogatory term use to refer to members of the Sureño gang) perpetrated the shooting.

On December 20, 2017, Officer Austin Huerta contacted Lopez in a "known Norteño hangout," smoking marijuana and drinking; Lopez was wearing all red and a 49'ers' logo. Huerta testified he had been told "SF" stands for "Scrap Free," which is why Norteños wear clothing associated with the San Francisco 49'ers. Lopez stated he was in good standing with the Norteño gang; he had new facial tattoos, including Mayan dots and bars symbolizing the number 14 on his left cheek and a huelga bird on his right cheek.

The People also introduced testimony about the other codefendants' prior contacts with law enforcement, focusing on incidents that had gang-related circumstances.

### Verdict and Sentencing

The jury acquitted all four defendants of attempted murder of E.D. and C.A. (counts 1 and 2, respectively) and was deadlocked on the lesser included offense of attempted voluntary manslaughter. The court declared a mistrial on the attempted voluntary manslaughter charge. The jury convicted all four defendants of shooting into an occupied motor vehicle in violation of section 246 (count 3) and found true allegations a principal used a firearm (§ 12022.53, subds. (c) & (e)(1)) and that the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). The jury was deadlocked as to all defendants on count 4, criminal street gang conspiracy in violation of section 182.5; accordingly the court declared a mistrial on this count. The jury convicted Lopez and Perez of battery in violation of section 242 in count 5 and

9.

found the offense was committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)(C)). The jury convicted Lopez of possession of a firearm by a convicted felon in violation of section 29800, subdivision (a)(1) (count 6).

## DISCUSSION

### I. Sufficiency of the Evidence

Lopez argues insufficient evidence supports his convictions for shooting at an occupied vehicle and felon in possession of a firearm. He also argues the evidence was insufficient to support the gang enhancement. We address and reject each of defendant's contentions in turn.

#### A. Standard of Review

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

#### B. Sufficient Evidence Supports Lopez's Conviction for Shooting at an Occupied Vehicle

Lopez first contends there was insufficient evidence he aided and abetted the shooting or that he could be liable for count 3 as a coconspirator. We disagree.

##### 1. Applicable Law

Section 246 provides in pertinent part: "Any person who shall maliciously and willfully discharge a firearm at an …. occupied motor vehicle, … is guilty of a felony…." "A violation of section 246 is a general intent crime." (*People v. Ramirez* (2009) 45

10.

Cal.4th 980, 985, fn. 6; see *People v. Iraheta* (2014) 227 Cal.App.4th 611, 620; *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500.)

To establish that a defendant is guilty of an offense as an aider and abettor, the prosecution must demonstrate that the defendant "'acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.]'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; accord, *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

"'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. …[¶] … [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*People v. Nguyen*, *supra*, 61 Cal.4th at p. 1054; accord, *In re Lynette G*. (1976) 54 Cal.App.3d 1087, 1094*; People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Jessie L*. (1982) 131 Cal.App.3d 202, 217.) "'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' [Citation.]" (*People v. Nguyen*, *supra*, at p. 1055.)

"'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy. [Citations.] A conspiracy requires (1) the intent to agree, and (2) the intent to commit the underlying substantive offense.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 870.) "'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."'" (*People v. Maciel* (2013) 57 Cal.4th 482, 515–516; accord, *People v. Homick*, *supra*, at p. 870 ["""The punishable act, or the very crux, of a

11.

criminal conspiracy is the evil or corrupt agreement."' [Citation.] [¶] If the agreement between the conspirators is the crux of criminal conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially"]; *People v. Ware* (2020) 52 Cal.App.5th 919, 940 ["Incidents occurring before the start of the conspiracy may be considered as circumstantial evidence supporting the existence of the conspiracy"].)

### 2. *Analysis*

Lopez contends, to the extent his conviction of count 3 for shooting at an occupied vehicle was based upon an aiding and abetting theory, the prosecution needed to prove he knew Nava was armed with a gun and that Lopez "in some way promoted Nava's use of it," but there was no evidence to support those conclusions. He argues any inference the defendants discussed shooting at E.D.'s car was "pure speculation." He further asserts the evidence was insufficient to establish he and his codefendants agreed to shoot at E.D.'s vehicle as necessary to support a conviction based on a conspiracy theory. On reply, he relies upon the Ninth Circuit Court of Appeals case, *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, in support of his contentions.[1] We conclude sufficient evidence supports this conviction.

Here, the jury was instructed it could convict Lopez of shooting at an inhabited vehicle under an aiding and abetting theory or as a coconspirator. And our review of the record reveals substantial evidence from which a rational trier of fact could have found Lopez guilty of this count beyond a reasonable doubt based on an aiding and abetting theory. The same evidence of Lopez's and the other defendants' conduct, relationship, interest, and activities before and during the offense, when viewed in the light most

---

[1]This case was overruled on other grounds in *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1248.

favorable to the judgment, also provides sufficient evidence to support a conclusion Lopez conspired to commit the shooting at E.D.'s vehicle.

The evidence at trial, including the surveillance footage of the events giving rise to the charges and testimony of the victims and officers, support a conclusion Lopez and Nava entered the store and instigated the initial confrontation with E.D. Lopez and Perez then escalated the verbal confrontation to a physical one by approaching E.D.'s car, grabbing and scratching him, and throwing their drinks at him. The surveillance footage shows the defendants hanging out together outside the gas station area, Perez staring at E.D. and C.A., and the roles each defendant assumed during the initial confrontation at the convenience store. It also can be viewed as depicting Lopez and Nava entering the backseat of the car after the initial confrontation at the gas station and before the defendants' car pursued E.D.'s car. The victims' testimony provided evidence two shots were fired from the defendants' car, the window of the backseat passenger of the defendants' car was down, and the defendants then fled. The prosecution also introduced significant evidence of the defendants' gang affiliation, which related to the defendants' relationship to one another, as well as evidence of the gang rivalry between Norteños and Sureños, and expert testimony regarding how crimes were typically executed by gang members, including that members typically notify others in the car with them if they are in possession of a weapon. There was also evidence Lopez was previously attacked by members of the rival Sureño gang at the same convenience store gas station six months before the charged incident, and E.D. appeared to be wearing rival gang colors on the night of the crime.

Considering all of this evidence together in the light most favorable to the verdict, it was reasonable for the jury to infer beyond a reasonable doubt Lopez intended to aid and abet the shooting at E.D.'s vehicle. (See *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1055 [substantial evidence supported jury's conclusion defendant aided and abetted attempted murder where he was passenger in car waiting in parking lot before pursuing

13.

victim's car; defendant stared at occupants in victim's car as they passed it; fellow gang member shot at victim's car from front seat; and gang expert testified to existing gang rivalry].). The jury could also reasonably conclude from this same evidence that Lopez conspired with the other defendants to commit the shooting. (See *People v. Jurado* (2006) 38 Cal.4th 72, 121 ["[a]lthough there is no direct evidence that defendant and [an accomplice] discussed in advance the killing of [the victim], there was evidence that they were alone together … shortly before the killing, during which a discussion and agreement could have taken place," from which jury could infer defendant and accomplice(s) had specific intent to agree or conspire to murder victim].)

In so holding, we disagree with Lopez's suggestion there needed to be direct evidence Lopez was aware a codefendant was armed. Rather, this fact could be inferred from the record presented. (See *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1055 [expert testimony regarding relevant gang rivalry and customary behavior including driving around "'hunting for their rivals,'" in context with "defendant's act of staring at the occupants of [the victim's] car—followed by his car's maneuver in an out of the restaurant parking lot—could have supported the inference that defendant was aware of the impending shooting and acted to facilitate it by identifying [the rival gang] members riding in [the victim's] car"].)

In so holding we conclude *Mitchell v. Prunty*, *supra*, 107 F.3d 1337, relied upon by Lopez, is distinguishable. In *Mitchell*, the Ninth Circuit concluded there was insufficient evidence the defendant aided and abetted a gang-related murder as there was no evidence he rendered any assistance or encouraged the driver who ran over the gang rival and crushed the victim. (*Mitchell*, at p. 1342.) The Ninth Circuit stated, "Membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting." (*Ibid*.)

Unlike in *Mitchell*, Lopez was not convicted of this offense solely based upon his presence in the car and his gang membership. Rather, evidence of his conduct before and

after the shooting, coupled with evidence of his motive, gang membership, and relationship to the other defendants, provided substantial evidence from which the jury could infer he conspired or aided and abetted the offense. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 ["'[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense'"]; *People v. Mejia* (2012) 211 Cal.App.4th 586, 607–610 [affirming multiple gang members' convictions for murder as aiders and abettors, including member who reluctantly went with others to rival's residence "'to have [his friend's] back'"]; accord, *People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20 [noting common gang membership can comprise part of the circumstantial evidence supporting the inference of a conspiracy].)

We reject defendant's first contention.

### C. Sufficient Evidence Supports Lopez's Conviction for Felon in Possession of a Firearm

Defendant next challenges his conviction for being a felon in possession of a firearm, arguing there was no evidence to support the jury's finding that he possessed a firearm. Again, we disagree.

#### 1. Relevant Procedural Background

Lopez was charged with one count of possession of a firearm by a felon. (§ 29800, subd. (a)(1); count 6.) The prosecution introduced certified records of Lopez's prior felony conviction for assault with great bodily injury with a gang allegation, with a conviction date of November 16, 2011.

The court instructed the jury with a tailored version of CALCRIM No. 2510 stating, in part:

> "To prove Defendant Lopez is guilty of this crime, the People must prove that:

15.

"One, he possessed a firearm; [¶] Two, he knew that he possessed a firearm; [¶] And three, he had previously been convicted of a felony. [¶] … [¶]

"Two or more people may possess something at the same time. A person does not have to actually hold or touch something to possess it. It is enough if the person had control over it or the right to control either personally or through another person."

The prosecutor then argued, with regard to the charge for possession of a firearm by Lopez:

"Count 6 is felon in possession of a firearm. Again, this only applies to Defendant Lopez. I must prove that he possessed a firearm. He knew he possessed a firearm, and he previously had been convicted of a felony. You have his certified records pertaining to his felony conviction, so that element has been established. The issue will be whether he possessed it, right? And he knew he possessed it, because no one saw a firearm in that case. But you don't need someone to get on that stand and tell you I saw a firearm, to know that a gun was used in this case by four Norteno gang members.

"So how do we know that he possessed it? Well, the law tells you two or more people may possess something at the same time. A person does not actually have to hold or touch something to possess it. It is enough if the person has control over it or the right to control it either personally or through another person.

"And that is what we have here. We have Defendant Lopez getting in the backseat of the car, followed by Defendant Nava. We know that backseat window was rolled down. That shot came from the backseat where those two were seated. They are active Norteno criminal gang members.

"Officer Arjona told you that the Norteno gang, they have to put each other on notice when one of them is carrying. That is when the Norteno gang members go out to commit a crime. They all aren't carrying. It only takes one person to shoot a gun. One person, but they are acting as a unit. They are acting together. They have control over that because they are in corroboration because they are the ones executing that situation, and that's what we have here."

16.

## 2. Applicable Law

Subdivision (a)(1) of section 29800 provides, in relevant part, "Any person who has been convicted of a felony … and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." "Possession may be physical or constructive, and more than one person may possess the same contraband." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410; accord, *People v. Williams* (2009) 170 Cal.App.4th 587, 625.) "Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda*, *supra*, at p. 410; accord, *People v. Newman* (1971) 5 Cal.3d 48, 53, disapproved on another point in *People v. Daniels* (1975) 14 Cal.3d 857, 862.)

## 3. Analysis

The parties dispute whether sufficient evidence supports the jury's conclusion Lopez "possessed" the gun. Lopez contends there was no evidence he had actual or constructive possession of the gun. He asserts there was no evidence he even knew a codefendant had a gun or that Lopez had the right to control it. Lopez argues, "At most, the evidence showed that [he] was near the gun when Nava fired it which is not a basis for a conviction of possessing the gun." The People respond the evidence showed Lopez and the other three gang members in the car were in joint possession of the firearm. They highlight that Ramos drove Perez's car, suggesting the gang members had the right to exercise control over each other's possessions at the time of the shooting. We conclude sufficient evidence supports Lopez's conviction for possession of a firearm by a felon.

Lopez does not dispute there was evidence from which the jury could conclude he was in the backseat of the car and the shots emanated from the backseat, supporting a conclusion he was in close proximity to and potentially had access to the gun. And we agree with his assertion his mere proximity or access to the gun, by itself, is insufficient to establish he possessed it. (See *People v. Bay* (2019) 40 Cal.App.5th 126, 132 ["'mere

17.

proximity' or opportunity to access the contraband, 'standing alone, is not sufficient evidence of possession'"]; accord, *People v. Land* (1994) 30 Cal.App.4th 220, 225 ["'[d]ominion and control are essentials of possession, and they cannot be inferred from mere presence or access. Something more must be shown to support inferring of these elements. Of course, the necessary additional circumstances may, in some fact contexts, be rather slight'"]; *People v. Zyduck* (1969) 270 Cal.App.2d 334, 336 [same].)

But we conclude the record here contains additional facts beyond Lopez's mere presence in the car or access to the firearm, which give rise to a reasonable inference he had constructive possession of it. As discussed *ante*, there was also evidence from which the jury could infer Lopez knew the gun was in the car and he facilitated its use; that is, he aided and abetted the shooting of E.D.'s car. The jury could have reasonably concluded as such based upon Lopez's and his codefendants' conduct before and after the shooting, Lopez's relationship to his codefendants, his gang affiliation, and the evidence of his interest or motive. Indeed, there was evidence Lopez was part of the initial verbal confrontation and escalated it into a physical confrontation. Based upon such evidence, in addition to the evidence of Lopez's access to the firearm based upon his presence in the car, we conclude a rational trier of fact could reasonably infer Lopez had the right to control the firearm. (See *People v. Land*, *supra*, 30 Cal.App.4th at p. 228 [evidence of defendant's presence in and access to stolen car coupled with evidence he and driver were friends, defendant knew car was stolen, and they used car for common criminal mission supported finding defendant had constructive possession of vehicle].) Accordingly, we conclude his conviction of possession of a firearm by a felon is supported by substantial evidence.

We reject Lopez's second contention.

### D.     Sufficient Evidence Supports the Gang Enhancements

In his initial briefing, Lopez argued insufficient evidence supports the gang findings necessary for the enhancements imposed under former section 186.22,

subdivision (b) and section 12022.53, subdivision (e)(1). While we are vacating the gang findings under Assembly Bill 333, as discussed further *post*, we still must address this claim to determine whether the enhancements may be retried on remand. We conclude the gang findings were supported by substantial evidence under the law in effect at the time of Lopez's trial.

### 1. *Applicable Law*

A gang enhancement applies to one who commits a felony for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. (Former § 186.22, subd. (b)(1); see *People v. Sanchez*, *supra*, 63 Cal.4th at p. 698.) At the time of trial, to sustain a gang enhancement, the prosecution has to prove "'that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period.'"[2] (*Sanchez, supra*, at p. 698; see former § 186.22, subd. (f).) Section 186.22, subdivision (e) lists the crimes that qualify as predicate offenses. "[T]he prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Prunty*, *supra*, 62 Cal.4th at p. 81; see *id*. at p. 75.) This is referred to as the "'sameness requirement.'" (*Id*. at pp. 76, 81.)

---

[2] As discussed further *post*, Assembly Bill 333 subsequently amended the language of section 186.22, subdivision (f). For purposes of our substantial evidence review in this part, we quote from and refer to the law in effect at the time of trial.

In *Prunty*, the California Supreme Court concluded "that where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together." (*Prunty*, *supra*, 62 Cal.4th at p. 71.)

### 2. Analysis

Lopez argues Arjona, the gang expert, testified about the Norteño gang in general and described predicate acts and primary activities of Norteños but offered no specific testimony connecting the Norteños who committed the predicate acts and primary activities with a Visalia subset or to the North Side Visa Boyz subset with which Lopez identified. He asserts, pursuant to *Prunty*, because the prosecution did not establish the predicate offenses were committed by members of a subset that shared a connection with the North Side Visa Boyz or that identified with a larger Norteño group, the evidence was insufficient to show the existence of a single "criminal street gang" encompassing both the group Lopez sought to benefit and the specific subsets whose members committed the predicate offenses. He further contends Arjona never testified regarding the primary activities of the NSVB subset, any other subset, or of the Visalia Norteños. We conclude the issue addressed in *Prunty* is not present in this case and the evidence was sufficient to support Lopez's gang enhancements.

In *Prunty*, the defendant was an admitted member of the Detroit Boulevard Norteño set. (*Prunty*, *supra*, 62 Cal.4th at p. 68.) The prosecution's theory underlying the gang enhancement charge was the defendant committed the charged assault to benefit the Sacramento-area Norteños. (*Id*. at p. 82.) To prove the predicate offenses, the gang

20.

expert in *Prunty* "described a 2007 confrontation between two Norteño gang subsets, the Varrio Gardenland Norteños and the Del Paso Heights Norteños, that led to two Varrio Gardenland members' convictions for a variety of offenses, including murder and attempted murder. [He also] testified about a 2010 incident in which members of the Varrio Centro Norteños shot at a former Norteño gang member. Besides [the expert's] testimony that these gang subsets referred to themselves as Norteños, the prosecution did not introduce specific evidence showing these subsets identified with a larger Norteño group. Nor did [the expert] testify that the Norteño subsets that committed the predicate offenses shared a connection with each other, or with any other Norteño-identified subset." (*Prunty*, *supra*, at p. 69.)

The *Prunty* court held "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 71.) Put differently, it is not "permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group." (*Id*. at p. 72.) The Supreme Court held insufficient evidence supported the gang enhancement in that case, concluding "the prosecution's evidence fell short … with respect to the predicate offenses. [The expert] referred to two offenses involving three alleged Norteño subsets …. Although [the expert] characterized these groups as Norteños, he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang." (*Id.* at p. 82.) That is, the expert's testimony did not "demonstrate that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that defendant sought to benefit. Although there was ample evidence that [the defendant] self-identified as both a member of the

Detroit Boulevard Norteños and the larger umbrella Norteño gang, and that he collaborated with a member of another subset to commit his present offenses, the prosecution presented no evidence that the members of the Varrio Gardenland and Varrio Centro Norteños self-identified as part of the umbrella Norteño gang." (*Prunty*, at pp. 82–83.)

By contrast, here, the prosecution's case positing the existence of a single "criminal street gang" for purposes of former section 186.22, subdivision (f) did not turn on the existence and conduct of one or more gang subsets. Rather, the prosecution's theory underlying the gang enhancement charge was the defendants committed the shooting at E.D. to benefit the broader Norteño gang, rather than a specific subset. Thus, the case hinged on proving the existence of the Norteños as a unitary gang under former section 186.22.

The prosecution introduced evidence Lopez self-admitted he was an active Norteño gang member on more than one occasion. During a field interview, Lopez specifically told Officer Alvarez "he was an active Northerner with the hood of being a Visa Boy." Officer Alverez explained that meant Lopez is a Norteño, Visa Boy is just a "clique or a common hood. It's just the sub-gang that is under the Norteno gang of which he belongs to." Officer Arjona explained all NSVB Norteño gang members are in Tulare County; they associate with the number 14 and share a common enemy in the Sureños; and the subset "fall[s] within the gang," "they're given orders." He further testified, "the hierarchy is based on communication from the street level all the way up to from [*sic*] an area of, like, Visalia." Street level Norteño gang members report up to someone in charge called a "channel," who reports up and to a Nuestra Familia gang member who is in charge of the county, and that gang member then reports to the prison side of the gang. Gang members pay taxes, which move up from the streets to the prisons. Officer Arjona explained different Norteño gang subsets share information and weapons, work together with members of other subsets, communicate with one another, and commit crimes

together.  Lopez bore tattoos representing North Side Visa Boyz and the umbrella Norteño gang, including one that said "114 percent Buster," a huelga bird on his face, and the Mayan symbol that represents the number 14—all symbols associated with the broader Norteño street gang.  There was also evidence Lopez previously associated with other Norteño gang members and was contacted in known Norteño hangouts.  Officer Arjona opined Lopez and the other defendants with whom he committed the charged crimes were Norteño gang members.  There was also evidence to support a conclusion the defendants attacked the victim because they associated him with the Sureños, a rival gang of the Norteños, and they used gang slurs during the initial confrontation.  Furthermore, Arjona discussed a hypothetical that mirrored the facts of the instant case; he opined in such an incident the four gang members were acting in association with each other and for a common goal that would benefit their gang—the Norteños.  Thus, the jury had sufficient evidence from which it could reasonably find Lopez's acts during the charged offenses were for the benefit of, at the direction of, or in association with the larger Norteño gang itself.

Lopez contends insufficient evidence was introduced to prove the primary activities of the criminal street gang in question.  Specifically, Lopez challenges the sufficiency of the gang expert's testimony, asserting he never testified to the primary activities of the NSVB subset or any other subset.  However, because the street gang that the prosecution sought to prove defendant's actions intended to benefit was the umbrella Norteño gang, we cannot conclude evidence regarding the primary activities of a distinct subset was necessary as in *Prunty*.  (See *Prunty*, *supra*, 62 Cal.4th at p. 76 ["the prosecution need not demonstrate the precise scope of an alleged gang, but it must allow the jury to reasonably infer that the 'criminal street gang' the defendant sought to benefit—or which directed or associated with the defendant—included the 'group' that committed the primary activities and predicate offenses"].)

And here, Arjona, the gang expert, testified to the primary illicit activities of the Norteño gang. He explained the Norteños' primary activities included "a lot of criminal activities," including, but not limited to, auto theft, possession of firearms, murder, attempted murder, assault, assault with deadly weapons, kidnappings, burglary, and vandalism. Such testimony was sufficient to establish the primary activities of the Norteños included the commission of one or more of the criminal acts enumerated in section 186.22, subdivision (e). (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 [expert testimony may be sufficient to establish gang's primary activities consist of criminal activity listed in gang statute]; *People v. Margarejo* (2008) 162 Cal.App.4th 102, 108 [expert's testimony as to primary activities of the gang constituted sufficient evidence].)

And there was also evidence the predicate offenses were committed by Norteño members in Tulare County for the benefit of the umbrella Norteño gang, not for the benefit of a distinct subset.[3] That is, Officer Arjona testified the subjects of the predicate offense cases were Norteño gang members without specifying a particular subset to which they belonged.[4] Thus, this case is distinguishable from *Prunty* in which the prosecution failed to establish a connection between the distinct subsets to which the subjects of the predicate offenses belonged and that with which the defendant was affiliated. Rather, here, the prosecution met the "sameness requirement" by presenting evidence the gang Lopez acted in association with and/or intended to benefit—the

---

[3]The certified records of conviction reflect the predicate crimes were committed in Tulare County. And Officer Arjona testified the crimes "fit[] the pattern of Norteño street gang activity here in Tulare County."

[4]Notably, one of the predicate offenses occurred at the Visalia Mall, evidencing the offense was committed on the North Side Visa Boyz' "turf," which, Officer Arjona testified, was Visalia. (See *Prunty, supra*, 62 Cal.4th at pp. 77–78 ["evidence that two seemingly unrelated Norteño cliques routinely act to protect the same territory or 'turf' could suggest that they are part of a larger association. Similarly, proof that several gang subsets conduct independent, but harmonious, criminal operations within a discrete geographical area may show that they are part of a single entity whose bosses have divided up a larger territory"].)

umbrella Norteño gang—was the same gang whose members committed the predicate offenses and whose primary activities were established by the evidence introduced at trial, including expert testimony. (See *Prunty*, *supra*, 62 Cal.4th at p. 91 [clarifying the scope of the majority opinion, stating, "The issue we address is a narrow one. It arises only when the prosecution seeks to prove a street gang enhancement by showing the defendant committed a felony to benefit a broader umbrella gang, but seeks to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang. Our decision is limited to that factual scenario"], conc. & dis. opn. of Corrigan, J.; accord, *People v. Ewing* (2016) 244 Cal.App.4th 359, 372–373 [*Prunty* does not apply where prosecution does not proffer predicate crimes of subset gang members to prove existence of criminal street gang]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 48–51 [sufficient evidence proved existence of criminal street gang—the Norteños—where prosecution's theory was defendants were Norteños, not members of subset, and predicate offenses were committed by Norteño members for benefit of that gang rather than subset].) On this record, we conclude there was sufficient evidence to support the jury's findings regarding the existence of a single "criminal street gang," as required for sustaining a gang enhancement.

Defendant argues *People v. Nicholes* (2016) 246 Cal.App.4th 836 establishes the evidence presented was insufficient to show the requisite connection between the subsets under *Prunty*; but *Nicholes* is inapposite. There the defendant was affiliated with a Sacramento Norteño subgroup but the predicate offenses occurred in a different county, and the perpetrators of the predicate crimes were alleged to be members from the other county and subsets distinct from the subset to which the defendant belonged. (*Nicholes*, *supra*, at pp. 845–846.) In *Nicholes*, the gang expert generally testified about the structure of the Norteño street gang and the use of regiment commanders to whom members paid a percentage of their taxes. (*Id*. at p. 847.) The court held the evidence was insufficient to establish a sufficient connection between the particular subset of

25.

which the defendant was a member and the subsets of which the subjects of the predicate offenses were members. In so holding, the court held "*Prunty* requires that the prosecution, in a case involving Norteños and testimony that Norteños operate through subsets, introduce evidence specific to the subsets at issue." (*Nicholes*, at p. 848.)

But here, unlike in *Nicholes*, there was no evidence the subjects of the predicate offenses were members of a subset distinct from that with which Lopez was affiliated, or that the group they sought to benefit was different from the group Lopez sought to benefit in his commission of the charged offense. Rather, the evidence only reflected they, like Lopez, were members of the larger Norteño gang. Thus, unlike in *Nicholes*, the issue raised in *Prunty* is not implicated here.

Accordingly, we reject defendant's contention.

## II. Lopez Is Entitled to Reversal of His Gang Enhancement Under Assembly Bill 333

In supplemental briefing, Lopez argues the imposed criminal street gang enhancements must be reversed because of changes made to section 186.22 by the recent enactment of Assembly Bill 333. We conclude Lopez is entitled to reversal of his gang-related enhancements.

### A. Assembly Bill 333

While Lopez's appeal was pending, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to provide new substantive and procedural requirements for gang enhancements. The legislation went into effect on January 1, 2022.

First, Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof that the gang is an *organized* association or group of three or more persons, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f)). Next, the law created a stricter requirement for proof of "a pattern of criminal gang activity," which is necessary to prove that the group with which

the defendant is associated is indeed a criminal street gang.  (See § 186.22, subd. (e).)

Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another.  (See former § 186.22, subd. (e).)  Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses.  (§ 186.22, subd. (e)(2).)  In addition, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed."  (§ 186.22, subd. (e)(1).)  The predicate offenses must have been committed by gang "members," and must have been for the "common[] benefit[] [of] a criminal street gang."  (§ 186.22, subd. (e)(1).)  Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity (compare former § 186.22, subd. (e)(1)–(33) with § 186.22, subd. (e)(1)(A)–(Z)).  Additionally, it defines "to benefit, promote, further, or assist" throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational."  (*Id.*, subd. (g).)  The legislation notes examples of a common benefit that are more than reputational "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.  (*Ibid.*)

Finally, Assembly Bill 333 adds section 1109, which requires gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.)  Section 1109 also requires the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.

**B. The Amendments to Section 186.22 Apply Retroactively and Lopez is Entitled to Reversal of His Gang Enhancements and Firearm Enhancement**

First, the parties agree Assembly Bill 333's amendments to section 186.22 altering the substantive requirements necessary to prove a gang enhancement operate retroactively. Because the legislation increased the evidentiary burden necessary to prove a gang-related enhancement, we agree it was an ameliorative change in the law that applies retroactively to cases not yet final on appeal.

Ordinarily, "a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287.) However, in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), our Supreme Court recognized an exception to this rule. The court explained that "[w]hen the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Id.* at p. 745.)

In subsequent years, the California Supreme Court has applied the *Estrada* doctrine broadly "to statutes changing the law to the benefit of defendants." (*Tapia v. Superior Court*, *supra*, 53 Cal.3d at p. 301; see generally *People v. Frahs* (2020) 9 Cal.5th 618, 631–632 [pretrial diversion statute is retroactive because it provides a "possible benefit" to a class of criminal defendants, does not contain express savings

28.

clause, and Legislature did not signal its intent to overcome *Estrada* inference]; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 309 ["Proposition 57 is an 'ameliorative change[] to the criminal law' that we infer the legislative body intended 'to extend as broadly as possible'"].)

Most relevant here, the Supreme Court in *Tapia* held the presumption of retroactivity applies to laws changing the substantive requirements for an enhancement in a defendant's favor. (See *Tapia v. Superior Court*, *supra*, 53 Cal.3d at pp. 300–301.) In *Tapia*, the electorate had recently passed an initiative requiring proof of intent to kill for certain special circumstance allegations. (*Ibid.*) Because the initiative "redefine[d], to the benefit of defendants, conduct subject to criminal sanctions," the court held the initiative applied retroactively. (*Id.* at p. 301.)

Like in *Tapia*, because Assembly Bill 333's substantive changes to section 186.22 "redefine, to the benefit of defendants, conduct subject to criminal sanctions," these changes apply retroactively to all cases—like Lopez's—in which the judgment of conviction is not yet final. (*Tapia v. Superior Court*, *supra*, 53 Cal.3d at p. 301; accord, *People v. Sek* (2022) 74 Cal.App.5th 657, 667 [concluding Assem. Bill 333's amendments to § 186.22 "'redefine[d], to the benefit of defendants, conduct subject to criminal sanctions,'" and therefore applies retroactively under *Estrada*]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 [similar]; see *People v. Lopez* (2021) 73 Cal.App.5th 327, 344 [concluding substantive changes in Assem. Bill 333 apply retroactively because they "increase[] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement"]; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822 [same].)

And here, it is undisputed Lopez is entitled to reversal of the gang enhancements on this basis; that is, neither party argues, nor can we conclude, the evidence presented at trial was sufficient to sustain the gang enhancements under the revised requirements of section 186.22. The parties agree, under the amended statute, the prosecution would need

to present evidence showing the current crimes, as well as the predicate offenses, commonly benefited the gang and the benefit was more than reputational.

Additionally, as the People note, at trial the prosecution introduced evidence of two cases committed in 2010 and 2012 as evidence of the predicate offenses necessary to establish a pattern of criminal gang activity. The last predicate offense did not occur within three years of the date the currently charged offense was committed—February 3, 2018—as required by amended section 186.22. (Stats. 2021, ch. 699, § 3.)

It is undisputed the existing record is insufficient to support these heightened evidentiary requirements set forth by amended section 186.22 following the enactment of Assembly Bill 333. As a result, the criminal gang enhancements must be reversed.

Additionally, because the imposed section 12022.53 enhancement applied to Lopez only because the jury concluded he violated section 186.22, subdivision (b) and because his penalty had been elevated to a life term through application of the alternate penalty provision provided for in section 186.22, the section 12022.53 enhancement is also no longer supported. The People agree this is also the correct result. Accordingly, the imposed firearm enhancement must also be vacated.

However, the People are not foreclosed from retrying Lopez on the gang enhancements and gang-related firearm enhancement upon remand under the new requirements of amended section 186.22. Put differently, "'[b]ecause we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.'" (*People v. Sek*, *supra*, 74 Cal.App.5th at p. 669; accord, *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 ["Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence"]; see *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory

30.

amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand"].)

## III.   Lopez May Raise His Remaining Claims Below

At sentencing, the court stated it intended "to exercise [its] discretion and stay the 667(A), the nickel prior." In his opening brief, Lopez asserts the court should have stricken rather than stayed his section 667, subdivision (a) serious felony enhancement, noting the same conviction—a 2011 assault with a gang enhancement—was used to increase his sentence under the three strikes law. He contends, pursuant to section 1385, the court only had discretion to strike this enhancement, not stay it. The People agree and respond they have no objection to the court striking this enhancement. Because we are reversing Lopez's gang-related enhancements and a new sentencing hearing will necessarily result, we do not address this contention further. Rather, the issue may be raised at resentencing.

Also, in his supplemental brief, Lopez contends he is entitled to resentencing in accordance with Senate Bill 567's amendment to section 1170, subdivision (b). He notes the court imposed a determinate term of six years, the upper term doubled, for count 5 (battery), and stayed another six-year term, the upper term doubled, for count 6 (gun possession).

At the time of Lopez's sentencing on January 23, 2020, section 1170 provided that the choice between sentencing a defendant to the lower, middle, or upper term "shall rest within the sound discretion of the court," with the court to determine which term "best serves the interests of justice." In doing so, the court could rely on "the record in the case, the probation officer's report, other reports … and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing." (Former § 1170, subd. (b), as amended by Stats. 2007, ch. 3, § 2.)

31.

Thereafter, Senate Bill 567 amended section 1170, affecting a trial court's sentencing discretion, including its ability to impose the upper term for a conviction. (Stats. 2021, ch. 731, § 1.3.)  The legislation limits the trial court's ability to impose the upper term unless certain circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt.  (*Ibid.*)

Again, because we reverse the true findings on Lopez's gang enhancements and his vicarious firearm enhancement based on Assembly Bill 333's amendments to section 186.22, we need not address this argument.  Rather, because of our conclusion, Lopez is ultimately entitled to a resentencing hearing at which he may raise his contention.

## DISPOSITION

The section 186.22, subdivision (b) gang enhancements and the section 12022.53 firearm enhancement are reversed, and the matter is remanded to the trial court for further proceedings. The People shall have 60 days from the date of the remittitur in which to file an election to retry Lopez on these enhancements.  If the People elect not to retry him, the trial court shall modify the judgment by striking the enhancements and shall resentence Lopez accordingly.  Following the conclusion of proceedings, the court shall amend the abstract of judgment in a manner consistent with this disposition and forward copies of the amended abstract to the appropriate law enforcement and custodial officials.  In all other respects, the judgment is affirmed.

PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


DE SANTOS, J.

32.